## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **DIOCESAN MIGRANT & REFUGEE** | § | |
| **SERVICES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-19-CV-00236-FM** |
| | § | |
| **UNITED STATES IMMIGRATION** | § | |
| **AND CUSTOMS ENFORCEMENT,** | § | |
| | § | |
| **Defendant.** | § | |

### ORDER GRANTING APPLICATION FOR ATTORNEY FEES AND COSTS

Before the court are "Plaintiff's Opposed Application for Attorney Fees and Costs"

("Motion") [ECF No. 56], filed November 2, 2020 by Diocesan Migrant & Refugee Services,

Inc. ("DMRS"); "Response to Plaintiff's Application for Attorney Fees and Costs"

[ECF No. 65], filed November 23, 2020 by United States Immigration and Customs Enforcement

("ICE"); and "Plaintiff's Reply to Defendant's Response to Plaintiff's Application for Attorney

Fees and Costs" ("Reply") [ECF No. 66], filed November 25, 2020. After due consideration of

the Motion, Response, Reply, and applicable law, the Motion is **GRANTED**.

## I.    BACKGROUND

### A.    *Pre-Trial*

In 2019, the United States government implemented a policy titled the Migrant Protection

Protocols ("MPP").  Pursuant to the MPP, selected asylum seekers must remain in Mexico while

they wait for U.S. immigration judges to hear their asylum cases.[1]  The MPP was first

---

[1] "Findings of Fact and Conclusions of Law" 3, ECF No. 44, entered Oct. 19, 2020.

implemented at the San Ysidro port of entry in January 2019.[2]  It was then implemented at the El Paso port of entry in May 2019 and at the Laredo and Brownsville ports of entry later in 2019.[3]

DMRS is a non-profit organization that provides know-your-rights information and legal representation for asylum seekers prior to their appearances before an immigration judge.[4]  It provided know-your-rights information to asylum seekers subject to the MPP during the brief time the asylum seekers were in the United States prior to immigration hearings.[5]  In June 2019, ICE and the United States Department of Justice Executive Officer for Immigration Review ("DOJ-EOIR") informed DMRS that it would no longer be permitted to provide know-your-rights-information to asylum seekers waiting for immigration hearings.[6]

On July 1, 2019, DMRS submitted a request for information to ICE pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 *et seq.*[7]  It sought records related to the implementation of the MPP and asylee access to attorneys prior to immigration hearings.[8]  ICE did not produce any responsive documents within the twenty-day statutory deadline.[9]  DMRS filed suit to compel production on August 22, 2019.[10]

---

[2] *Id.*

[3] *Id.*

[4] "Plaintiff's Original Complaint" ("Compl.") 2 ¶ 6, ECF No. 1, filed Aug. 22, 2019; "FOIA Request," Ex. 1.  *See also* Plaintiff's Opposed Application for Attorney Fees and Costs" ("Mot."), ECF No. 56, filed Nov. 2, 2020, "Declaration of Melissa M. Lopez" 3, ECF No. 56-1, Ex. 3.

[5] *Id.*

[6] *Id.* at 2 ¶ 7.

[7] Findings of Fact and Conclusions of Law 3.

[8] *Id.*

[9] *See id.* at 5.  *See also* 5 U.S.C. § 552(a)(6)(A)(i).

[10] *See generally* Compl.

Toni Fuentes ("Fuentes"), a Deputy FOIA Officer for ICE, was immediately responsible for supervising ICE responses to requests for records under FOIA. [11]  Due to an ICE administrative error, ICE did not become aware of DMRS's FOIA request until after the initiation of this lawsuit.[12]  Fuentes assisted in locating DMRS's FOIA request, at which time she assigned the request to the litigation team of the ICE FOIA Office for expedited processing of the request.[13]

Approximately four-and-a-half months after the statutory deadline to respond, on December 16, 2019, ICE notified DMRS it identified ninety-two pages of potentially responsive records.[14]  Ten pages were provided in full, twenty-eight pages contained redacted information, fourteen pages were deemed non-responsive or duplicates, and the remaining forty pages required "consultation with other agencies or components" and ICE stated they would "be produced at a later date."[15]  On May 22, 2019, DMRS filed its motion for summary judgment arguing ICE had not conducted a search reasonably calculated to uncover responsive records and had not met its burden to show that records it withheld were exempt from disclosure.[16]

On May 29, 2020, nine months after Plaintiff filed suit and almost eleven months after Plaintiff sent its original FOIA request, ICE forwarded the pages requiring consultation to other agencies for review.[17]  ICE admitted that a second administrative error prevented timely referral

---

[11] *Id*. at 2–3.

[12] "Transcript of Bench Trial" 15, ECF No. 63, filed Nov. 16, 2020.

[13] *Id*. at 13.

[14] Findings of Fact and Conclusions of Law 2.

[15] *Id*.

[16] *See generally* "Plaintiff's Motion for Summary Judgment," ECF No. 14, filed May 22, 2020.

[17] Findings of Fact and Conclusions of Law 11.

of these documents.[18]  While the consultations were pending, ICE filed five motions for extensions of the deadline to respond to DMRS's motion for summary judgment.  ICE finally responded on June 25, 2020, twenty days after the original deadline.  That same day, almost eleven months after the statutory deadline, ICE produced thirty-three of the forty pages requiring consultation.[19]  ICE did not address these documents in its response.  DMRS challenged redactions to the thirty-three pages produced after its motion for summary judgment but withdrew its objections to previously produced materials.[20]

B.      Trial

On October 5, 2020 the court held a bench trial to resolve two issues: 1) whether ICE conducted a search reasonably calculated to uncover responsive records; and 2) whether redactions pursuant to 5 U.S.C. § 552(b)(5) ("exemption (b)(5)") to the thirty-three pages produced June 25, 2020 were exempt from disclosure.[21]  The parties were present and represented by counsel.  Fuentes was ICE's sole witness.

One subdivision of ICE Enforcement and Removal Operations ("ERO") is ERO Field Operations ("FOPS"), the office responsible for providing MPP guidance to all ERO field offices.[22]  After consideration of Fuentes's testimony, the court found ICE was on notice that DMRS's request sought communications between ICE ERO agents and their contractors at the field office level about implementation of the MPP; correspondence to ICE ERO officers and

---

[18] "Transcript of Bench Trial" 61, ECF No. 63, filed Nov. 16, 2020.

[19] Findings of Fact and Conclusions of Law 2.  *See also* 5 U.S.C. § 552(a)(6)(A)(i) (providing a twenty-day deadline, excluding weekends and holidays for agencies to respond to FOIA requests).

[20] "Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment" 2–3, ECF No. 29, filed July 29, 2020.

[21] Findings of Fact and Conclusions of Law 2.

[22] *Id.* at 9.

4

their contractors who were responsible for movement and custody of respondents subjected to the MPP; emails by or between ERO field offices where the MPP was implemented; and emails of guidance between officers and contractors at the field office level regarding the MPP participants' access to counsel before their immigration court hearings.[23]

The court also found:

- ICE program offices have no written guidelines on how to conduct searches for records responsive to FOIA requests.[24]

- Each program office within ICE has its own guidelines for record keeping, retention schedule, and records liaison officers.[25]

- Fuentes instructed her points of contact ("POCs") in three program offices to conduct searches for responsive documents: the ICE Office of Policy, ICE Office of the Principal Legal Advisor ("OPLA"), and ICE ERO.[26]

- No uniform set of search terms was used across the various ICE program offices.[27]

- No POC described to what extent, if any, they took into consideration the particular record keeping practices of their respective program offices in searching for responsive documents.[28]

- ERO FOPS, the office responsible for providing MPP guidance to all ERO field offices, determined the requested information did not fall in its area of responsibility and did not conduct any search for responsive documents.[29]

---

[23] *Id*. at 4–5.

[24] *Id*.

[25] *Id*. at 6.

[26] *Id*.

[27] Findings of Fact and Conclusions of Law 6.

[28] *Id*.

[29] *Id*. at 9.  *See also* Memorandum from Nathalie R. Asher, Acting Executive Associate Director, U.S. Immigration and Customs Enforcement, to Field Office Directors, Enforcement and Removal Operations, "Migrant Protection Protocols Guidance" (Feb. 12, 2019).

The court then turned to the thirty-three pages of redacted documents produced to Plaintiff after consultation with Customs and Border Patrol and the Department of Homeland Security Office of Privacy.[30]  ICE provided only a letter to accompany the produced documents.[31]  Two paragraphs in the letter address the redactions made pursuant to exemption (b)(5).[32]  The letter did not identify which privilege supported each redaction made under redaction (b)(5).[33]  Nor did either provide DMRS with any factual basis for the application of exemption (b)(5) to any individual redaction.[34]  Fuentes's testimony was equally inadequate.

Upon conclusion of ICE's case, DMRS moved for judgment as a matter of law as to both issues.  The court granted the motion and, on October 19, 2020, entered corresponding "Findings of Fact and Conclusions of Law" [ECF No. 44].  The court ordered that the thirty-three pages originally produced to DMRS on June 25, 2020 be unredacted and produced to DMRS by October 26, 2020.[35]  It also ordered ICE to conduct a new search for documents responsive to DMRS's FOIA request by November 2, 2020.[36]

C.    *Post-Trial*

On November 2, 2020, the deadline for ICE to conduct its new search, ICE informed the court it had not yet conducted any search and moved for an extension of time do so.[37]  ICE

---

[30] Findings of Fact and Conclusions of Law 11.

[31] *Id*. at 12.

[32] *Id*.

[33] *Id*. at 12.

[34] *Id*.

[35] "Final Judgment" 1, ECF No. 45, entered Oct. 19, 2020.

[36] *Id*.

[37] "Defendant's Unopposed Motion for Extension of Time, or in the Alternative, Motion to Alter or Amend a Judgment," ECF No. 53, filed Nov. 2, 2020.

requested the deadline be extended to November 23, 2020 with respect to a search for responsive records from the El Paso Field Office and asked for an additional thirty days upon completion of a search of the El Paso Field Office to search for responsive records from the San Antonio and San Diego Field Offices.[38]  ICE did not express any concern about the procedural feasibility of the deadline, merely citing counsel's personal circumstances. The court granted ICE an additional extension of all search deadlines to November 23, 2020.[39]

A week after the second deadline, on November 30, 2020, ICE moved for yet another extension of time to comply with the court's order.[40]  For the first time, ICE informed the court of the procedure it intended to follow in conducting its new, more thorough, search for responsive documents.  ICE also expressed concern for the impossibility of the court's deadline in light of the search requirements.  ICE informed the court it conducted an examination of its records utilizing thirteen search terms in records from forty-nine custodians. That examination identified approximately 2.3 million potentially responsive documents.[41]  After using software to extract irrelevant and duplicative documents, approximately 86,000 potentially responsive documents remained.[42]  ICE then assigned thirty percent of its FOIA staff to conduct first-line review full-time.[43]  Ten to fifteen attorneys would dedicate half of every work day to second-line

---

[38] *Id*. at ¶ 8.

[39] "Order Granting in Part and Denying in Part Motion for Extension of Time" 2, ECF No. 57, entered Nov. 3, 2020.

[40] *See generally* Defendant's Amended Unopposed Motion for Extension of Time to Produce Documents," ("Nov. Mot. For Extension") ECF No. 70, filed Nov. 30. 2020.

[41] *Id*. at ¶¶ 7–8.

[42] *Id*. at ¶ 11.

[43] *Id*. at ¶ 47.

review.[44]  ICE estimated staff would require four months to produce all responsive records from the El Paso field office.[45]  Thereafter, the parties would confer to present a new scheduling order for remaining documents.[46]  The court entered an order granting the extension.[47]  ICE did not appeal any part of the court's judgment.  As a result, the court's Findings of Fact and Conclusions of Law are now the law of the case. ICE cannot contest either.[48]

## II.   LEGAL STANDARD

FOIA states "[t]he court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed."[49]  Accordingly, the court must apply a two-prong test to determine: (1) "whether a plaintiff has substantially prevailed" and, if so, (2) "whether the plaintiff *should* receive fees."[50]

A Plaintiff has "substantially prevailed" and therefore satisfied the first prong if it obtained requested relief through a judicial order.[51]  The second prong, also known as the "entitlement" prong, requires courts to consider: "(1) the benefit to the public deriving from the

---

[44] *Id*. at ¶ 48.

[45] *Id*. at ¶ 59.

[46] Nov. Mot. For Extension ¶ 59.

[47] *See generally* "Order Granting Second Motion for Extension of Time," ECF No. 71, entered Dec. 1, 2020.

[48] *See Arizona v. California*, 460 U.S. 605, 618 (1983) (The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case.")  *See also Ashe v. Swenson*, 397 U.S. 436, 443 (1970) (The collateral estoppel doctrine stands for the principle that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.")

[49]  5 U.S.C. § 552(a)(4)(E)(i).

[50] *Batton v. IRS*, 718 F.3d 522, 525 (5th Cir. 2013) (emphasis in original).

[51] 5 USC § 552(a)(4)(E)(ii); *Batton*, 718 F.3d at 525.

case; (2) the commercial benefit to the complainant; (3) the nature of the complainant's interest in the records sought; and (4) whether the government's withholding of the records had a reasonable basis in law."[52]  The entitlement prong requires courts to conduct analysis through the lens of the three fundamental purposes of FOIA's legal fee provision. The provision is designed: (1) "as an incentive for private individuals to pursue vigorously their claims for information" and overcome barriers "that government may erect in an effort to escape compliance with the law;" (2) to "deter the government from opposing justifiable requests;" and (3) "to punish the government where such opposition is unreasonable."[53] An award of attorneys' fees is particularly appropriate where "'government officials have been recalcitrant in their opposition to a valid claim or have been otherwise engaged in obdurate behavior.'"[54]

## III. DISCUSSION

### A. *Whether DMRS Should Receive Attorney Fees*

The Final Judgment entered in this action definitively establishes DMRS substantially prevailed in its FOIA action as this court granted all of the requested relief.[55]  This is not contested.  Accordingly, the court proceeds to a determination of whether DMRS should receive attorney fees in light of the circumstances of the case and the essential purposes of the FOIA legal fee provision.

---

[52] *Texas v. ICC,* 935 F.2d 728, 730 (5th Cir. 1991).

[53] *Cazalas v. Dep't of Justice,* 709 F.2d 1051, 1057 (5th Cir. 1983).

[54] *Id.* at 1054 (quoting S.Rep. No. 93–854, at 19 (1974)).

[55] *See* 5 USC § 552(a)(4)(E)(ii)(I) ("a complainant has substantially prevailed if the complainant has obtained relief through . . . a judicial order . . ."); *Batton,* 718 F.3d at 525.

1.    The Benefit to the Public Deriving from the Case

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the government accountable to the governed."[56]  Viewing the public benefit factor through the lens of FOIA's high-minded central purpose, attorneys fees are more appropriate "where the complainant's victory is likely to add to the fund of information that citizens may use in making vital political choices."[57]  Courts take into consideration "the degree of dissemination and the likely public impact that might be expected from a particular disclosure."[58]

DMRS requested information about ICE's decision to prohibit asylum seekers' access to attorneys and to know your rights information.  Denial of access to counsel and rights information has broad-ranging due process consequences for asylum seekers fleeing persecution.  The documents responsive to DMRS's FOIA request are very likely to be of significant consequence to the large numbers of asylees and their advocates.  As DMRS intends to use the requested records to "determine how to move forward with providing information and representation to asylum seekers in the MPP program,"[59] it has already begun the process of making documents obtained through this litigation available to other non-profit legal service organizations in the El Paso area, fellow advocates, and members of the press.[60]

Our nation's comprehensive immigration policy has been part of the national dialogue for well over a decade.  In the recently concluded presidential cycle it figured prominently in the

---

[56] *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

[57] *Blue v. Bureau of Prisons*, 570 F.2d 529, 534 (5th Cir. 1978).

[58] *Id.* at 533.

[59] Mot. 5.

[60] Mot., "Declaration of Melissa M. Lopez" 3, ECF No. 56-1, Ex. 3.

campaigns of every presidential candidate and most candidates seeking federal office.  An element of that policy is the treatment of refuge and asylum seekers. Responsive documents would provide valuable insight into the execution of a rapidly evolving and controversial policy dealing with that segment of the immigrants pursuing admission to our country.  As this information is both of public concern and useful to political decision making, the diffusion of documents will spread beyond legal service providers to the wider public.  An award of attorney fees will foster the spirit of private litigants to vigorously pursue claims for information vital for democratic society and discourage the government from the cavalier treatment of appropriate and lawful requests such as DMRS is pursuing.

The public benefit is not reduced by the change in administration since the initiation of this lawsuit and before ICE has finished reviewing and producing all responsive documents.  The delays are completely attributable to ICE's own administrative errors, absence of clearly defined methods and procedures to determine places and databases to search, lack of effective and comprehensive procedures for adequately processing FOIA requests, and repeated requests for extensions of deadlines.  ICE's ineptitude in responding to valid requests for information and failure to comply with this court's deadlines cannot be counted in its favor.  To do so would make a mockery of the accountability principles underlying FOIA.

ICE's handling of this FOIA request is precisely encompassed in the Fifth Circuit's holding that attorney fees are particularly appropriate where "'government officials have been recalcitrant in their opposition to a valid claim or have been otherwise engaged in obdurate behavior.'"[61]  Potential FOIA complainants must be incentivized to pursue meritorious claims without fear that the duration of the lawsuit would make the information sought "old news," no

---

[61] *Cazalas v. Dep't of Justice,* 709 F.2d 1051, 1054 (5th Cir. 1983) (quoting S.Rep. No. 93–854, at 19 (1974)).

longer in the public eye, and defeat a motion for compensation by simply delaying response. Therefore, this factor weighs strongly in favor of granting attorney fees.

        2.      <u>The Commercial Benefit to the Complainant and Nature of Complainant's Interest in the Records Sought</u>

When the commercial benefit to a plaintiff and the nature of the plaintiff's interest in records sought are similar it is useful to consider these factors together.[62]  In weighing the commercial benefit factor, courts consider whether the party requesting fees is indigent or a non-profit organization rather than a large corporate interest.[63]  Similarly, the nature of the complainant's interest weighs in favor of granting attorney fees if the plaintiff seeks to protect the public interest, rather than merely a private interest.[64]  These factors further congressional intent that the prohibitive costs of litigation not exclude the indigent and public interest groups from pursuing relief.[65]

There is no commercial benefit to DMRS in the records sought.  DMRS is a non-profit organization that provides know-your-rights information and legal representation to indigent asylum seekers.  Its central purposes in seeking the documents are to protect its constituents' due process rights and to facilitate the fair adjudication of political asylum claims.  Receipt of responsive records furthers DMRS's organizational purpose by bolstering its ability to protect the public interest in the administration of justice in the immigration system.  Responsive records are also likely to raise public awareness of issues of political importance through the distribution

---

[62] *Id.*

[63] *Blue v. Bureau of Prisons*, 570 F.2d 529, 533–34 (5th Cir. 1978).

[64] *Id*. at 534

[65] *Id*. (citing S.Rep. No. 854, 93d Cong., 2d Sess. 19 (1974)).

of responsive records to other immigrant advocacy groups and the media.  As such, both factors weigh in favor of granting attorney fees.

        3.     <u>Whether the Government's Withholding of the Records had a Reasonable Basis in Law.</u>

FOIA requires federal agencies to make their records promptly available to any person who makes a proper request for records.[66]  "[T]he threshold question in any FOIA suit is whether the requester can even *see* the documents the character of which determines whether they can be released."[67]  Accordingly, the FOIA statute provides that, when the government withholds information from disclosure, the agency has the initial burden to prove *de novo* that the information is exempt from disclosure.[68]  This court's findings of fact document the abysmal inadequacy of the search and the unsupported redactions.  In considering whether to award attorney fees, the threshold is lower.  The government's withholding needs only to have had a reasonable basis in law for ICE to avoid attorney fees.[69]  ICE showed no reasonable basis to withhold the documents.

        a.     Adequacy of Search

ICE failed to establish even a colorable basis in law exists to support the adequacy of its search for documents responsive to DMRS's FOIA request.  "Even when an agency does not deny a FOIA request outright, the requesting party may still be able to claim 'improper' withholding by alleging that the agency has responded in an inadequate manner."[70]  An agency's

---

[66] 5 U.S.C. § 552(a)(3)(A).

[67] *Cooper Cameron Corp. v. U.S. Dep't of Labor, OSHA,* 280 F.3d 539, 543 (5th Cir. 2002).

[68] 5 U.S.C. § 552(a)(4)(B); *Batton v. Evers*, 598 F.3d 169, 175 (5th Cir. 2010).

[69] *See Texas v. ICC,* 935 F.2d 728, 730 (5th Cir. 1991).

[70] *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 n.12 (1991) (citations omitted).  *See also Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980) (recognizing the judicial

search is adequate if it is "reasonably calculated to uncover all relevant documents."[71]  "The adequacy of an agency's search is measured by a standard of reasonableness and is dependent upon the circumstances of the case."[72]  The focus is on the reasonableness of the search, not the result.[73]  An agency must "make more than perfunctory searches and, indeed, [] follow through on obvious leads to discover requested documents."[74]

There is no reasonable basis in law to believe ICE's search was reasonably calculated to uncover all responsive documents.  Testimony about ICE's search was inconsistent and generalized.  Fuentes described general ICE procedure for responding to FOIA requests without knowledge of the specifics.  Fuentes did not conduct any search herself.[75]  Nor could she testify as to the precise search procedure—Fuentes conceded her knowledge was limited to information on search forms POCs provided to her office.[76]  ICE had all the time it requested to prepare for trial and to marshal all evidence it deemed appropriate.  Even so, it did not call a single witness able to explain the rationale for the search conducted at any single program office.

In explanation of ICE's failure to conduct a methodical agency-wide search for responsive records, Fuentes stated the agency was "young" and "playing catch-up," seemingly

---

authority conferred by the FOIA to devise remedies for agencies contravening the statute through improper withholdings).

[71] *Weisberg v. U.S. Dep't. of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *Batton v. Evers*, 598 F.3d 169, 176 (5th Cir. 2010).

[72] *Id*.

[73] *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994).

[74] *Valencia-Lucena v. U.S. Coast Guard,* 180 F.3d 321, 325 (D.C. Cir. 1999).

[75] Findings of Fact and Conclusions of Law 6.

[76] "Transcript of Bench Trial" 35–36, 83–84, ECF No. 63, filed Nov. 16, 2020.

acknowledging deficiencies.[77]  In an apparent contradiction, she then said the reason for the lack of uniformity was to honor the subject-matter expertise within individual program offices.[78] Since record keeping practices vary across program offices, Fuentes reasoned, ICE conducts non-uniform searches.

Due to this model, Fuentes could not testify as to either the record keeping or searching practices of any program offices or their subdivisions.  POCs did not provide that information in their search forms.  The returned search forms indicate different search terms were used across program offices without any apparent reason for the lack of uniformity.  Fuentes could not say whether a given search was reasonable in the context of the recordkeeping practices of a program office as she was not familiar with those practices and the POCs provided no explanation.

ICE's deference to the subject-matter expertise of individuals within each program office is neither strategic nor efficient.  It shows indifference to the purpose of the search.  Without testimony about each program office's record keeping practices, ICE cannot show the search process was reasonably calculated to uncover all responsive documents.

The search was too narrow to be expected to uncover all responsive documents.  Only five individuals in an agency of several thousand searched their email accounts for responsive correspondence.[79]  These individuals used a variety of inconsistent search terms.  The entirety of the search within the ERO Enforcement Division records was for a single search term within the Deputy Assistant Director's email account: the acronym "MPP."[80]  Fuentes could not say with any level of assurance that this search uncovered responsive documents containing the spelled-

---

[77] *Id*. at 19–20.

[78] *Id*. at 20.

[79] "Transcript of Bench Trial" 77, ECF No. 63, filed Nov. 16, 2020.

[80] *Id*. at 95.

out acronym.[81]  Some individuals may have searched only within specific folders.[82]  Some may have excluded deleted, archived, or sent emails by searching only within their inboxes.[83] Fuentes could not be sure and could only interpret the returned search forms.

ICE failed to show it conducted a reasonable search within ERO FOPS.  DMRS's request sought communications about guidance and instruction to employees regarding day-to-day movement of MPP participants wherever the MPP was established.  FOPS is responsible for providing guidance and coordination to the twenty-four ERO field offices.[84]  ERO field offices are responsible for the custody of all MPP participants from the port of entry to the immigration court.[85]  A publicly available memorandum by the Acting Executive Associate Director of ICE instructs field office directors to assign a lead POC for MPP issues within their offices.[86]  The memorandum tasks these POCs with issuing local operational guidance applicable to the MPP.[87] These facts conclusively indicate FOPS is reasonably likely to have records responsive to DMRS's FOIA request.  They also indicate ICE was aware that field offices possess records responsive to FOIA requests for information related to the MPP.

Inexplicably, FOPS determined DMRS's FOIA request did not fall within its area of responsibility and declined to conduct any search.  It is troubling FOPS disregarded the plain

---

[81] *Id*. at 96.

[82] *Id*. at 87.

[83] *Id*. at 88.

[84] Findings of Fact and Conclusions of Law 9.

[85] "Transcript of Bench Trial" 68, ECF No. 63, filed Nov. 16, 2020.

[86] Memorandum from Nathalie R. Asher, Acting Executive Associate Director, U.S. Immigration and Customs Enforcement, to Field Office Directors, Enforcement and Removal Operations, "Migrant Protection Protocols Guidance" (Feb. 12, 2019).

[87] *Id*.

language of a publicly available memo in determining it had no records responsive to DMRS's FOIA request.  There is no reasonable basis in law to support ICE's inadequate search.

b.      Exemptions

ICE gave no reasonable basis in law to redact the thirty-three pages it produced on June 25, 2020.  When the applicability of an exemption to disclosure under FOIA is in dispute, an agency is required to provide a detailed justification for exemption claims, correlating justifications for refusal to disclose with actual portions of records claimed to be exempt.[88]  A common way in which agencies do so is through a *Vaughn* index.[89]  In *Vaughn*, the D.C. Circuit held that a system of itemizing and indexing exemptions' legal and factual bases would easily remedy the problem of conclusory and generalized allegations of exemptions.[90]  This procedure makes clear the factual nature of the information sought and the specific reason it falls within the statutory exemption asserted.[91]  Since *Vaughn*, it has become standard practice for agencies to supply the court with a *Vaughn* index.[92]

Under FOIA exemption (b)(5), an agency can withhold information covered by a recognized evidentiary or discovery privilege.[93]  Exemption (b)(5) protects from disclosure:

> inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that

---

[88] *Batton v. Evers*, 598 F.3d 169, 175 (5th Cir. 2010) (citing *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

[89] *See Vaughn*, 484 F.2d at 827.

[90] *Id*. at 826–27.

[91] *Stephenson v. IRS*, 629 F.2d 1140, 1144 (5th Cir. 1980).

[92] *See, e.g.*, *Batton*, 598 F.3d at 178–79; *Flight Safety Servs. Corp. v. Dep't of Labor*, 326 F.3d 607, 613 (5th Cir. 2003); *Stephenson*, 629 F.2d at 1145.

[93] *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 738–39 (D.C. Cir. 2017).

the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested.[94]

Thus, "[e]xemption 5 incorporates the privileges which the government enjoys under the relevant statutory and *case law* in the pretrial discovery context."[95]  Three common law privileges encompassed in exemption (b)(5) include: (1) the attorney work-product privilege; (2) the attorney-client privilege; and (3) the governmental deliberative process privilege.[96]

After repeated opportunities to demonstrate to this court how exemption (b)(5) applies to the records ICE sought to withhold, ICE did not meet its burden to support exempting any information redacted pursuant to exemption (b)(5) from disclosure.  ICE presented no evidence at either the summary judgment phase or at trial supplying the factual or legal basis for any application of exemption (b)(5).  Although settled law establishes the preparation of a Vaughn index, ICE did not generate one.  ICE simply provided a brief letter to accompany the thirty-three pages of responsive documents at issue.  The letter stated that redactions under exemption (b)(5) qualified for protection under one or more of the three named privileges, without specifying which, and without any factual basis for the application of exemption (b)(5) to any individual redaction.

ICE's only witness shed no more light on the factual basis for the exemptions.  Fuentes admitted she was not involved in redacting the documents at issue and therefore had no personal knowledge to speak of.[97]  Nor did she seem to have secondary knowledge on which the court could rely due to her role as agency representative.  Fuentes stated she reviewed the exemptions

---

[94] 5 U.S.C. § 552(b)(5).

[95] *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1984) (citations omitted) (emphasis in original).

[96] *Tax Analysts v. IRS*, 294 F.3d 71, 76 (D.C. Cir. 2002).

[97] "Transcript of Bench Trial" 57–58, ECF No. 63, filed Nov. 16, 2020.

claimed and agreed with them.[98]   However, when asked directly about why entire pages had been

subject to exemption (b)(5), she stated she did not know what the pages contained.[99]   When

asked about a specific redacted page, she could not say whether it was the end of the preceding

document, an attachment, or part of a subsequent document.[100]

Fuentes's lack of knowledge regarding the substance of the redactions often led her to

speculate to fill in the gaps.   When asked whether redacted emails were sent to agents executing

the MPP on-the-ground, she responded, "they do not appear that way as redacted."[101]   In

reference to another redacted email, Fuentes stated that, as two attorneys were included among

other undisclosed recipients, she believed the email to contain legal advice.[102]   She later admitted

she did not know who else received the email and was aware emails are not necessarily

privileged just because an attorney is included in an email chain.[103]

Fuentes was not only uncertain of the content of responsive records; she was uncertain

and inconsistent in providing underlying reasons for redactions.   She alternated between

identifying the specific privilege applied and admitting she could not state with any confidence

which privilege supported each redaction.   She openly speculated about which privilege may

have applied based on context clues in the released portions.   More than once, she equivocated,

stating perhaps the redactor had relied on one of the three privileges cited or perhaps on all

---

[98] *Id.* at 120.

[99] *Id.* at 144.

[100] *Id.*

[101] *Id.* at 103.

[102] *Id.* at 140–41.

[103] "Transcript of Bench Trial" 146, ECF No. 63, filed Nov. 16, 2020.

three.[104]  Fuentes's testimony was not reliable.  Even had Fuentes confidently testified as to the privileges relied upon by the redactors, she is not a lawyer.[105]  She therefore does not have the education or training to provide an explanation as to *why* a particular privilege was invoked.

While Fuentes was knowledgeable about the procedure ICE uses to apply exemptions generally, she was unable to bridge the gap between that procedure and the factual basis for exemptions applied in this case.  Both the fundamental principle of public access to government documents and the general principle of full agency disclosure require agency representatives to have more than mere confidence in the procedure followed.  They require clear statements of both the factual nature of the information withheld and whether it falls within a specific statutory exemption.[106]  Without either, the explanation is not only legally insufficient, it lacks any reasonable basis in the law.  ICE did less than the bare minimum to justify its exemptions and instead attempted to shift the burden to the court and to DMRS.  This forced DMRS to expend considerably more in attorney labor and fees to litigate exemptions to documents produced at the eleventh hour and without the easy remedy of a *Vaughn* index.  Therefore, the final factor in the entitlement prong, like all others, weighs in favor of granting attorney fees.

B.    *Whether the Amount of Attorney Fees Requested is Reasonable*

As DMRS substantially prevailed and is entitled to attorney fees, the court must consider whether the amount requested is reasonable.[107]  District courts have broad discretion in

---

[104] *Id*. at 146–47.

[105] *Id*. at 132–33.

[106] *See Batton v. Evers*, 598 F.3d 169, 176 (5th Cir. 2010) ("The central issue . . . is whether the [evidence] submitted by [the agency] . . . sufficiently identif[ies] the documents at issue, including the relevant information contained in each document, and explain[s] why the asserted exemptions justify withholding.").

[107] *See* 5 U.S.C. § 552(a)(4)(E)(i) ("The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred . . .").

calculating reasonable attorney fee awards.[108]  Reasonable attorney fees are determined in two

steps.  First, the court calculates the "lodestar."[109]  The lodestar is the product of the reasonable

hourly rate multiplied by the number of hours reasonably expended on the litigation.[110]  The

party requesting fees bears the burden of establishing the reasonableness of fees, hours billed,

and billing judgment exercised.[111]  There is a presumption that the lodestar amount is a

reasonable fee.[112]

In step two, the court may adjust the fee award up or down after consideration of the

factors articulated in *Johnson v. Georgia Highway Express, Inc.* not already included in the

calculation of the lodestar.[113]  However, neither party requests attorney fees depart from the

lodestar.  Accordingly, the court will not advance to the second step of the attorney fee inquiry

and calculation of the lodestar alone will determine the amount of the attorney fee award.

       1.    <u>Compensable Hours</u>

To calculate the lodestar, a district court must first determine the compensable hours from

the attorney's time records, including only hours reasonably spent.[114]  Each hour claimed must

---

[108] *Hensley v. Eckerhart,* 461 U.S. 424, 434 (1983); *Watkins v. Fordice,* 7 F.3d 453, 457 (5th Cir. 1993).

[109] *League of United Latin Am. Citizens No. 4552 v. Roscoe Indep. Sch. Dist*., 119 F.3d 1228, 1232 (5th Cir. 1997).

[110] *Hensley,* 461 U.S. at 434.

[111] *Saizan v. Delta Concrete Pro. Co.*, 448 F.3d 795, 799 (5th Cir. 2006).

[112] *City of Burlington v. Dague,* 505 U.S. 557, 562 (1992).  *See also Walker v. U.S. Dep't. of Hous. and Urban Dev.*, 99 F.3d 761, 771–72 (5th Cir. 1996) (describing the limited circumstances in which an adjustment to the lodestar is permitted).

[113] 488 F.2d 714, 717–19 (5th Cir. 1974).  *See also Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986) (holding that *Johnson* factors that are subsumed in the calculation of the lodestar may not provide an independent basis for increasing the fee award).

[114] *Hensley,* 461 U.S. at 436–37.

be supported by attorney billing records.[115]  The court must exclude "excessive, redundant, or otherwise unnecessary" hours.

DMRS requests compensation for 125.7 hours worked by lead counsel, Christopher Benoit ("Benoit").[116]  In support, it submits a billing statement detailing hours worked by Benoit. According to the billing statement, the billed hours are reduced from a total of 132 hours to eliminate redundant or administrative hours.[117]  In order to prevent duplication of work, DMRS also does not request compensation for hours worked by co-counsel or counsel's administrative assistant.[118]  At the time DMRS filed its Motion DMRS estimated an additional ten hours of work would be performed to cooperate with ICE in creating and completing a new search in compliance with this court's order.[119]  ICE disputed only that the FOIA fee shifting provision permitted compensation for work yet to be performed.[120]  DMRS then submitted documentation of an additional 12.8 hours worked in compliance with the court's order to construct a new search and amended its request to substitute these hours for the prospective fees.[121]  These hours are therefore no longer speculative and will be considered alongside all other hours.

The hours billed reasonably reflect the time spent on litigation and are compensable. FOIA matters present legal complexities requiring a significant investment of time to fully research and brief.  This case proceeded to trial, which required significant time to prepare

---

[115] *Watkins v. Fordice,* 7 F.3d 453, 457 (5th Cir. 1993).

[116] Mot. 10.

[117] Mot., "19-cv-00236 Billing Statement" 2, ECF No. 56-1, Ex. 1-B.

[118] Mot. 8.

[119] *Id*. at 10.

[120] Resp. 3 fn. 2.

[121] *See* "Plaintiff's Reply to Defendant's Response to Plaintiff's Application for Attorney Fees and Costs" 6, ECF No. 66, filed Nov. 25, 2020.

opening and closing statements, exhibits, an expert witness, and cross-examination. The quality of pleadings submitted and trial advocacy displayed by Mr. Benoit was of the first order. It is remarkable that he and his litigation team did so much quality work in the time claimed.

Benoit represents DMRS on a contingent fee basis.[122]  He charged no hourly rate and will not be compensated beyond court awarded attorney fees.  Benoit exercised reasonable billing judgment by omitting any charge for time contributed by co-counsel and his administrative assistant.  The court finds no excessive, redundant, or otherwise unnecessary hours in counsel's billing statement.

Besides the usual time requirement for actions proceeding to trial, this case presented unusual complications resulting from the government's own obstructionist behavior.  ICE's repeated delays and administrative errors needlessly extended the duration of this action and required numerous phone calls, emails, and conferences that would otherwise have been unnecessary.  ICE also complicated the summary judgment phase by untimely producing responsive documents after DMRS filed its motion and the dispositive motion deadline had passed, thereby preventing DMRS from disputing redactions to those documents before its reply. In turn, as both parties had not had an opportunity to brief the issue, this court was unable to address the contested redactions at that phase and carried the issue over to trial.[123]

Even now, ICE continues to stall and delay its search for responsive documents.  For the first time, ICE claims the substantial backlog of FOIA requests and its limited personnel makes

---

[122] Mot. 7.

[123] *See* "Order Denying Motion for Summary Judgment" 6, ECF No. 30, entered Aug. 25, 2020; *Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 702 (5th Cir. 2010).

timely compliance impossible.  However, administrative backlog does not form a reasonable basis in law to withhold responsive documents.[124]

As ICE did not have a faintly colorable claim that its search complied with the statute, this newfound claim of impossibility proves how indifferent ICE was to its statutory duty.  Had ICE responded in conformity with the statute, the enormity of the task they now claim would have been identified in the summer of 2019 and not in the winter of 2020.  Meanwhile, DMRS and its counsel must continue to expend time and resources pursuing its claim, even after completely prevailing at trial.  DMRS has met its burden to show the reasonableness of the 138.5 hours billed by Benoit.

        2.    <u>Hourly Rate</u>

Next, the district court must "select an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases."[125]  "Generally, the reasonable hourly rate for a particular community is established through affidavits of other attorneys practicing there."[126]

DMRS requests an hourly rate of $325-375.[127]  In support of its requested rate, DMRS provides a declaration from Benoit, expanding on the time and effort expended by counsel;[128] a declaration from attorney Lynn Coyle, attesting to both the work done by Benoit in this case and

---

[124] *See Miller v. U.S. Dep't of State,* 779 F.2d 1378, 1390 (8th Cir. 1985)(holding that attorney fees cannot be denied on the reasonableness of the government's position where the government cites processing backlogs, confusion, and administrative error, because these "are practical explanations, not reasonable bases.").

[125] *Shipes v. Trinity Indus.*, 987 F.2d 311, 319 (5th Cir. 1993).

[126] *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002).

[127] *Id*. at 7.

[128] *See generally* Mot., "Declaration of Christopher Benoit," ECF No. 56-1, Ex. 1.

the prevailing rate for comparable legal work;[129] and a declaration from John P. Mobbs

("Mobbs"), a seasoned El Paso attorney qualified as an expert in attorney fees, opining that the

fees requested in this case are below the reasonable contingency fee range in El Paso.[130]

ICE contends the proposed rate is excessive and unreasonable as it exceeds the hourly

rate of El Paso attorneys with comparable experience as listed in the 2015 State Bar of Texas

Hourly Rate Fact Sheet ("Fact Sheet").[131]  ICE cites to a string of unreported district court

opinions relying on the Fact Sheet to calculate reasonable attorney fees according to various

statutory fee-shifting provisions.[132]  The line of cases relying on the Fact Sheet is unpersuasive.

First, the Texas Bar has not published an updated Fact Sheet since 2015.  Five-year-old fee data

is unreliable and likely to skew lower than current attorney fees.  The Fact sheet itself notes a

7.4% increase in median rates from 2013 to 2015.[133]

Second, it is uncertain that even a 2021 Fact Sheet would accurately represent the

reasonable hourly rate for the El Paso legal community.  DMRS included with its motion a

Review of the State Bar of Texas *2015 Hourly Fact Sheet* by Statistician N. Shirlene Pearson,

Ph.D. ("Dr. Pearson").[134]  Dr. Pearson stated the Texas Bar survey underlying the Fact Sheet data

suffered from the fatal defects of a limited sample size, selection bias, and suboptimal

---

[129] *See generally* Mot., "Declaration of Lynn Coyle Pursuant to 28 U.S.C. § 1746." ECF No. 56-1, Ex. 5.

[130] *See generally* Mot., "Declaration of John P. Mobbs," ECF No. 56-1, Ex. 2.

[131] Resp. 5.  *See also*, Resp., "State Bar of Texas 2015 Hourly Fact Sheet" ("Fact Sheet") ECF No. 65-1, Ex. A.

[132] *See e.g.*, *Alvarez v. McCarthy*, No. 6:16-CV-00172-ADA, 2020 WL 1677715, at *6 (W.D. Tex. Apr. 6, 2020).

[133] Fact Sheet 4.

[134] *See generally* Mot. "Review of the State Bar of Texas *2015 Hourly Fact Sheet* report and its Use by the Texas Judiciary in Deciding Plaintiff Attorney Hourly Fees in Labor-Employment Cases" ("Review of Fact Sheet") ECF No. 56-1, Ex. 1-C.

methodology.[135]  Moreover, the hourly rates listed on the Fact Sheet do not distinguish between reported billing method: hourly fees, flat rates, contingency fees, or discounted fees for volume clients.[136]  Dr. Pearson concluded the Fact Sheet does not reliably reflect the hourly rates of attorneys in Texas.[137]  Tellingly, the Texas Bar itself warns against using the Fact Sheet to set attorney fees.[138]

Finally, the Fifth Circuit has not adopted the Fact Sheet as a determinative measure of reasonable attorney fees in a given community.  Instead, Fifth Circuit jurisprudence is based on trial court reliance on attorney affidavits.[139]  ICE does not dispute the unreliability of the Fact Sheet or offer its own attorney affidavits.  Instead, it merely points to non-binding law and argues the court should blindly follow it.  After consideration of the significant limitations of the Fact Sheet, this court relies on the three attorney declarations supporting the Motion, which compellingly concur that the requested rate is reasonable.

The large amount of work done in such a low number of hours is the direct result of Benoit's high level of litigation skills and accompanying effectiveness. Given the delays and conduct of ICE in this case, a less experienced attorney would have easily spent a substantially higher number of hours.  By way of illustration, 190 compensable hours at $275 would yield a total of $52,250 in attorney fees—more than Benoit requested.  ICE's objection to the proposed hourly rate is solely based on a much-discredited study and not on Fifth Circuit jurisprudence.

---

[135] *Id.*

[136] *See generally* Fact Sheet.  *See also* Review of Fact Sheet 5.

[137] Review of Fact Sheet 6.

[138] Texas State Bar, Demographic & Economic Trends: Economic Trends, available at https://www.texasbar.com/AM/Template.cfm?Section=Demographic_and_Economic_Trends (last accessed Jan. 20, 2021).

[139] *See Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002).

26

To follow ICE's rationale would simply discourage highly skilled attorneys like Benoit from taking on difficult cases like this one.  DMRS has met its burden to show the reasonableness of its requested fee.

Considering the applicable law and pertinent facts before this court, an hourly rate of $375 will be applied to calculate the lodestar.  After multiplying this rate by the 138.5 compensable hours, reasonable attorney fees in this case are $51,937.50.

C.    *Plaintiff's Bill of Costs*

Pursuant to 28 U.S.C. § 1920, a judge may include costs for fees of the clerk of court and service of summons of subpoena in a judgment upon filing of a bill of costs.  In its bill of costs, DMRS requests such reimbursement in the amount of $432.20.[140]  ICE does not challenge these costs.[141]  After due consideration, the court finds it in the interest of justice to grant DMRS's bill of costs.

## IV.    CONCLUSION

Accordingly, the court enters the following orders:

1.    **IT IS HEREBY ORDERED** that "Plaintiff's Opposed Application for Attorney Fees and Costs" [ECF No. 56] is **GRANTED**.

2.    **IT IS FURTHER ORDERED** that Plaintiff Diocesan Migrant & Refugee Services shall **RECOVER** from Defendant United States Immigration and Customs Enforcement **$51,937.50** for work performed in this case.

---

[140] "Bill of Costs" 1, ECF No. 55, filed Nov. 2, 2020.

[141] Resp. 1 fn. 1.

3.      **IT IS FURTHER ORDERED** that Plaintiff Diocesan Migrant & Refugee Services shall **RECOVER** from Defendant United States Immigration and Customs Enforcement costs of the court in the amount of **$432.20**.

**SIGNED AND ENTERED** this <u>**28th**</u> day of **January 2021**.


                                              _____
                                              **FRANK MONTALVO**
                                              **UNITED STATES DISTRICT JUDGE**